MILES D. FREEMAN, SBN 299302
mfreeman@ftc.gov
CARLA L. CHEUNG, SBN 291562
ccheung1@ftc.gov
SIOBHAN C. AMIN, SBN 308416
samin@ftc.gov
JOHN D. JACOBS, SBN 134154
jjacobs@ftc.gov
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Tel: (310) 824-4300
Fax: (310) 824-4380

[Additional Attorneys for Plaintiffs Listed on Signature Page]

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION; and THE PEOPLE OF THE STATE OF CALIFORNIA, <br><br> Plaintiffs, <br><br> v. <br><br> NGL LABS, LLC, a corporation; <br><br> RAJ VIR, individually and as an officer of NGL LABS, LLC; and <br><br> JOAO FIGUEIREDO, individually and as an officer of NGL LABS, LLC, <br><br> Defendants. | Case No. 2:24-cv-5753 <br><br> **COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF** |

Plaintiffs the Federal Trade Commission ("FTC") and the People of the State of California, by and through the District Attorney of Los Angeles County (collectively, "Plaintiffs"), for their Complaint allege:

1.      The FTC brings this action for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8401 *et seq*., and the Children's Online Privacy Protection Rule ("COPPA Rule"), 16 C.F.R. § 312.  For these violations, the FTC seeks relief, including a preliminary and permanent injunction, monetary relief, and other relief pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, Section 5 of ROSCA, 15 U.S.C. § 8404, and Sections 1303(c) and 1306(d) of the Children's Online Privacy Protection Act of 1998 ("COPPA"), 15 U.S.C. §§ 6502(c), 6505(d).

2.      The People of the State of California, by and through George Gascón, District Attorney of Los Angeles County, bring this action against Defendants for violation of the California Unfair Competition Law ("UCL") (Bus. & Prof. Code § 17200 *et seq.*) and the California False Advertising Law ("FAL") (Bus. & Prof. Code § 17500 *et seq*.).

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over the federal law claims pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.  This Court has supplemental jurisdiction over the subject matter of the state law claims pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), (b)(3), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFFS

5.      The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court

civil action by its own attorneys.  15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces ROSCA, 15 U.S.C. §§ 8401-8405, which requires Internet sellers to meet disclosure, consent, and cancellation requirements before charging consumers through a negative option feature.  A negative option feature is a provision of a contract under which the consumer's silence or failure to take affirmative action to reject a good or service or to cancel the agreement is interpreted by the negative option seller as acceptance or continuing acceptance of the offer, and an example of such a provision is a subscription.  The FTC also enforces the COPPA Rule, 16 C.F.R. § 312, which requires operators of an online service directed to children or with actual knowledge of the collection of personal information from a child to obtain verifiable parental consent prior to any collection, use, or disclosure of personal information from children.

6.     The People of the State of California, by and through George Gascón, District Attorney of Los Angeles County, are authorized to enjoin repeated and persistent fraudulent, unlawful, deceptive, and misleading business conduct under the California Unfair Competition Law (Bus. & Prof. Code § 17200 *et seq.*) and the California False Advertising Law (Bus. & Prof. Code § 17500 *et seq.*) to obtain equitable or other appropriate relief, including restitution, civil penalties, and an injunction as may be appropriate.

## **DEFENDANTS**

7.     Defendant NGL Labs, LLC ("NGL Labs") is a Delaware corporation with its principal place of business at 253 North La Peer Drive, Beverly Hills, CA 90211.  NGL Labs transacts or has transacted business in this District and throughout the United States.  At all times relevant to this Complaint, acting alone or in concert with others, NGL Labs has advertised, marketed, distributed, or sold

the NGL App and NGL Pro to consumers throughout the United States.

8.     Defendant Raj Vir ("Vir") is a co-founder of NGL Labs and currently the company's CEO and Technical Lead.  At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of NGL Labs described in this Complaint.  For example, Vir personally coded and designed a substantial portion of the NGL App and directed the other Defendants and NGL employees with regards to the conduct alleged herein.  Vir was also aware of the violations of law alleged herein and of consumer complaints regarding said violations.  For example, Vir discussed these violations of law and consumer complaints in text messages with other NGL Labs employees.  Vir is also the individual responsible for incorporating NGL Labs and is listed as an officer on its corporate paperwork.  Vir resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

9.     Defendant Joao Figueiredo ("Figueiredo") is a co-founder of NGL Labs and currently the company's Growth & Marketing Lead.  At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of NGL Labs described in this Complaint.  For example, Figueiredo has personally handled marketing and customer support for the NGL App and directed the other Defendants and NGL employees with regards to the conduct alleged herein.  Figueiredo has also acted as a point of contact for NGL Labs when communicating with media outlets and app stores regarding the NGL App.  Figueiredo was aware of the violations of law alleged herein and of consumer complaints regarding said violations.  For example, Figueiredo discussed these violations of law and consumer complaints in text messages with other NGL

Labs employees.  Figueiredo resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

## COMMERCE

10.    At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### *Defendants Create the NGL App and Sell NGL Pro Subscriptions*

11.    Defendants develop and operate a social media app ("NGL App") that can be installed on Apple and Android devices.  The NGL App purports to allow consumers to receive anonymous messages from their friends and social media contacts.  The NGL App is named after the abbreviation "ngl," which is often used as shorthand for the phrase "not gonna lie."

12.    Defendants market and distribute the NGL App through the Apple App Store and the Google Play Store.  The NGL App itself is free to download but contains an in-app purchase ("NGL Pro") which is a paid subscription service.

13.    A consumer who downloads the NGL App is prompted to create an NGL account.  As part of the account sign-up process, the NGL App asks the consumer to provide their Instagram or Snapchat username.  The NGL App then stores the consumer's Instagram or Snapchat username, along with a copy of the consumer's Instagram or Snapchat profile picture in a database, where it is associated with the consumer's NGL ID.  The NGL App does not ask consumers how old they are during the account creation process and does not utilize any form of age screening.

14.    The NGL App purports to allow consumers to receive anonymous messages from their friends and social media contacts.  Consumers can send pre-

generated prompts for their friends and social media contacts to answer anonymously (e.g., "Send me a pickup line and I'll tell you if it worked," "If you could change anything about me, what would it be?," "Who would you ship me with?," "Share an opinion that'll get you cancelled"). Defendants have described the NGL App as a "fresh take on anonymity" that provides a "safe space for teens." Defendants have represented that the NGL App will allow "people to share their honest feelings and opinions with their followers."

15.     Once the consumer chooses a prompt that they want to post, the NGL App generates a unique personalized link for the consumer to share. The consumer copies this link and then posts it and the prompt to their social media account or elsewhere, as shown here in Image 1, which has been used in Defendants' marketing material on the Apple App Store. Individuals who click on this link are then taken to Defendants' website, where they can write in an anonymous message that will be sent to the consumer along with the prompt that the consumer has chosen. In at least some instances, Defendants have run advertisements on this website that generated revenue for Defendants.



Image 1

16.     The NGL App also contains built-in functionality that enables a consumer to automatically post their personalized link to Instagram, X (previously known as Twitter), and Snapchat. The NGL App, however, is not limited to these platforms and consumers are able to post their NGL links to other social media

platforms and websites as well.  Indeed, the Defendants themselves have acknowledged that NGL links can, and are, sent through means other than Instagram, X, and Snapchat.

17.     After an anonymous message is sent, the consumer receives a notification that they have a new message in their inbox.  Upon opening the notification, the consumer is taken to the message.  Below the message are two buttons that invite the consumer (1) to find out "who sent this" and (2) to reply to the anonymous message by posting it to their social media profile with a response.

18.     When a consumer who has not yet subscribed to NGL Pro taps on the "who sent this" button, a popup appears inviting them to unlock NGL Pro.  Prior to July 2022, Defendants represented through this popup that NGL Pro subscribers could see "who sent" a message and that "pro members can see exclusive hints on each message."  Since July 2022, Defendants still represent that NGL Pro subscribers can see "who sent" a message and also represent that NGL Pro subscribers will receive "Sender Info" and "hints like [the sender's] location, device, ngl id, and more."

19.     After the consumer purchases NGL Pro and again clicks on the "who sent this" button, they are not provided with the identity of the sender of the message.  Instead, the consumer is shown "hints" about the sender of the message such as the type of phone the sender used (e.g., an iPhone), the time the message was sent, and, in some (but not all) instances, the city or region that the sender may live in.  Consumers are never told "who sent" the message and, as discussed below, even some of the hint data that has been provided is false.

20.     As part of the NGL App, Defendants also collect and store various pieces of data regarding individual consumers, including those under the age of 13.  During sign-up, Defendants collect, store, and maintain the consumer's Instagram or Snapchat username and the consumer's Instagram or Snapchat profile picture.

Consumers are also able to upload their own profile pictures within the NGL App, which Defendants collect, store, and maintain as well.  Defendants also collect, store, and maintain consumer IP addresses, browser user agent information, and data regarding the operating system, manufacturer, model, and location of the device sending an anonymous message.  Defendants also collect, store, and maintain consumer activity data such as the pages or screens a consumer has viewed, how long a consumer spent on a page or screen, browsing history, and duration of access.  Defendants store and maintain this data indefinitely and do not delete the data.  Defendants also fail to honor requests from parents to delete personal information collected from children online.

### *Defendants Use Fake Messages to Drive Engagement with the NGL App & to Increase Sales of NGL Pro*

21.    Defendants launched the NGL App on the Apple App Store on December 10, 2021.  In the six months following its launch, less than 1,000 consumers downloaded the NGL App.

22.    Recognizing the low level of interest in the NGL App, Defendants took steps to increase consumer engagement with the App, such as attempting to increase the number of consumers who download the App, the amount of time consumers spend in the App on average, and the number of times consumers share the NGL link.

23.    In an effort to boost engagement, Defendants began developing messages that would be sent to consumers and would appear to come from real people, but, in reality, would be sent automatically whenever a consumer posted an NGL prompt.  These fake, computer-generated messages (or, as Defendants refer to them in their internal communications, "fake questions") would be sent as replies to consumers who posted a prompt inviting anonymous messages.  For example, a consumer who posts the "Send me anonymous messages!" prompt to

-7-

their social media profile would begin to receive computer-generated fake messages such as:

- "are you straight?"
- "have you done drugs"
- "have you ever cheated"
- "have you ever had any surgery"
- "I know what you did"
- "I miss you"
- "I wish we talked more"
- "are u single?"
- "when was the last time you wet the bed"
- "what's your toxic trait?"
- "one of your friends is hiding s[o]mething from u"
- "I've had a crush on you for years and you still dont know lmao"
- "would you say yes if I asked you out – A"

Consumers who select other prompts receive fake messages as well including, for example, fake messages regarding stalking the consumer's social media profiles and hating the sender's best friend.  Defendants ultimately created and deployed over 1,000 unique fake, computer-generated messages like these in an effort to trick consumers into believing that their friends and social media contacts were engaging with them through the NGL App.  Since launching the NGL App, Defendants have sent millions of fake, computer-generated messages to consumers.

    24.    Defendants' own internal communications reveal that Defendants knew that these messages were deceiving and harassing consumers and that Defendants actively participated in the violations of law alleged herein.  For example, Defendant Figueiredo wrote, "These ppl addicted… there's people

-8-

sharing the [NGL App link] EVERY day and all they get is fake questions 😂." Defendant Figueiredo further observed that "[o]ne thing that can be make or break actually is the fake questions. I think [right now] they're designed to make the user feel something, but not really optimized for replies[.] I think we should do actual questions ppl would wanna answer[.]" Defendant Figueiredo also remarked that "I feel like a lot of 'harassment' complaints come from fake questions lol[.]" Defendant Figueiredo also noticed that, when consumers living in non-English language countries were presented with fake messages, they were more likely to stop using the App (referred to by the Defendants as "churning"), because it was obvious to the consumer that the messages were fake given that they were in a different language than the one primarily spoken in that country.

25.    As Defendants integrated these fake messages into the NGL App, consumer engagement with the NGL App grew exponentially. After having struggled to convince even a few hundred people to download the NGL App, Defendants saw consumer growth explode in June and July of 2022, with millions of new consumers downloading and using the NGL App. At more than one point during this period, the NGL App was reported to be the most downloaded app in the Apple App Store.

26.    As more consumers downloaded the NGL App, so too did an increasing number of consumers purchase NGL Pro. Notably, Defendants included the prompt for consumers to buy the NGL Pro subscription to see "who sent" a message even when the message that the consumer had received was a fake message that the Defendants themselves had generated.

27.    Over time, some consumers noticed and complained that they were receiving fake messages to the prompts they had posted. Dozens of consumers left negative reviews on the Apple App Store and Google Play Store complaining about the use of fake messages. Consumers also submitted numerous complaints

to Defendants directly.  In their reviews and complaints, consumers described Defendants' fake messages as "invasive," "anxiety inducing," "harass[ing]," "hateful," "concerning," "personal," "weird," and "annoying."  Consumers noted that the fake messages, in many instances, completely ruined the user experience and caused users to regret downloading the NGL App.  Worse, consumers complained that these fake messages had tricked them into purchasing NGL Pro in an effort to find out who had sent the fake message.  After learning that the message was fake and sent by the Defendants, consumers frequently declared the NGL App to be a "scam" and requested refunds for their NGL Pro subscriptions.

28.    Despite being aware of these reviews, Defendants continued to flood consumer inboxes with fake messages.

29.    In addition to consumer complaints, media outlets also began to report on Defendants' use of fake messages and the ensuing deception.  In July 2022, journalists working at multiple media outlets reported testing the NGL App and receiving fake messages.  Defendants reviewed this media reporting and even commented on it in their internal communications, yet continued to send fake messages.

30.    Undeterred by consumer complaints and negative media coverage, Defendants continued to send fake messages to consumers in an effort to drive downloads and NGL Pro subscriptions.  On July 6, 2022, Defendants Vir and Figueiredo discussed the use of fake messages when considering whether to send push notifications to consumers.  In response to the suggestion that they send a notification to consumers telling the consumer that they had a new message waiting for them, Defendant Vir admitted that "New messages [is] kinda a lie though right[?]"  But when Defendant Figueiredo pointed out that the "new message" notification resulted in significantly higher engagement by consumers, Defendant Vir acquiesced, writing, "Hmm. So maybe we just need to do forever

fake questions lol[.]"  Defendant Figueiredo also suggested that the team change the way fake messages were sent to stop consumers from "easily finding out" that Defendants were sending fake messages.

31.     Defendants' own employees also raised concerns regarding the number of fake messages being sent.  On July 17, 2022, one of Defendants' employees wrote, "Why are we still sending fake notifications[?] I have a lot of reviews complaining about this[.]"  In response, Defendant Vir instructed the team to "Continue to send fake questions" but noted that Defendants would be adding, in small text, a notation at the bottom of the fake messages that would read "Sent with ❤️ from team NGL."  However, Defendant Figueiredo pushed back against providing even this ambiguous statement, writing, "Im not 100% sold we need to address fake questions. We can just make it a lot smarter and way harder to find out we sent them[.]"  In response, the company's Product Lead wrote, "I think we need to address [the fake messages].  This is what the press are attacking and I'm sure apple knows . . .The last thing we want is Apple saying we're tricking people to buying [NGL Pro] through fake questions."

32.     In or around August 2022, Defendants added the line "Sent with ❤️ from team NGL" to their fake messages but Defendant Figueiredo himself acknowledged that this verbiage was ineffective, writing, "I feel like [people] read that and don't think 'this is an automated message' or 'it's a bot[.]' Feels like an actual message they can reply to[.]"

*Defendants Fail to Disclose the Costs and Limitations of NGL Pro and Violate ROSCA*

33.     Defendants also charged consumers for NGL Pro, which is sold in transactions effected on the Internet, without disclosing material terms and without obtaining express informed consent from consumers.  In marketing NGL Pro, Defendants fail to clearly and conspicuously disclose the costs of NGL Pro and

what consumers will receive after subscribing.

34.     When consumers receive a message in the NGL App, they are presented with a button inviting them to learn "who sent this."  When a consumer clicks on the button, if the consumer is not already subscribed to NGL Pro, a popup invites them to purchase an NGL Pro to find out "who sent" the message.

35.     Prior to July 2022, Defendants told consumers through this popup that "pro members can see exclusive hints on each message."  Below a pulsating button to purchase NGL Pro, in small, difficult to read, off-white text, Defendants wrote that "pro renews for $9.99 per week."  A screenshot showing Defendants' pre-July 2022 representation is shown below as Image 2.

36.     Since July 2022, Defendants have continued to use the "who sent this" button while now describing NGL Pro as allowing a consumer to learn "Sender Info" and "hints like [the sender's] location, device, ngl id, and more[.]"  Below the pulsating button to purchase NGL Pro, Defendants now state in small inconspicuous grey text that "pro renews for $6.99/week."  A screenshot of Defendants' new representation is shown below as Image 3.





**Image 2**

**(Pre-July 2022)**

**Image 3**

**(Post-July 2022)**

37.    Defendants charge consumers $6.99 for the first week and each week thereafter until the consumer cancels NGL Pro.

38.    Upon purchasing NGL Pro to learn "who sent" the message that the consumer received, a consumer does not actually receive information showing who sent them the message.  Rather, the consumer is presented with "hints" about the message, such as the type of phone that the sender used (e.g., an iPhone), the time the message was sent (e.g., 1:00 PM), and, in some (but not all) instances, the country and general location of the sender (e.g., near Los Angeles).  These hints do not disclose "who sent" the message that the consumer received.

-13-

39.     Additionally, in at least some instances, even these "hints" were false. For example, at least as of June 24, 2022, some consumers who purchased an NGL Pro subscription would be told that a message was sent by someone using an iPhone even when, in fact, that was not true.  Defendants were aware of these inaccuracies and discussed them in their internal communications with one another.

40.     Numerous NGL Pro subscribers have complained that, despite paying for NGL Pro, they were not told "who sent" a particular message and were deceived by Defendants' representations regarding NGL Pro.  This deception was further evidenced through consumer reviews in the app stores and complaints submitted directly by consumers to Defendants.

41.     Many consumers also did not understand that NGL Pro was a negative option recurring subscription and did not consent to being billed automatically on a recurring basis.  Instead, these consumers understood, based on Defendants' deceptive representations, that NGL Pro was a one-time purchase and, accordingly, did not consent to weekly negative option billing.  This deception was evidenced through complaints submitted directly by consumers to Defendants, complaints submitted to the Apple App Store and Google Play Store, and feedback from Apple to Defendants directly.

42.     Indeed, on July 11, 2022, Apple warned Defendants that the NGL App "attempts to manipulate customers into making unwanted in-app purchases by not displaying the billed amount clearly and conspicuously to the users."  Apple even went so far as to accuse Defendants of cheating and scamming their customers through their sales of NGL Pro.

43.     Defendants responded to Apple's concerns by making only small, insignificant changes to the NGL App that did not meaningfully address the inadequate disclosures and lack of consent.  For example, as shown above in Image

-14-

3, Defendants made the disclosure of the price of NGL Pro (and its recurring nature) only slightly more visible by changing the font color from off-white to light gray.  And Defendants added the language "Sender Info get hints like their location, device, ngl id, and more."  These changes had little impact and consumers continued to complain that they were unaware they signed up for a weekly recurring subscription and were misled into believing that they would learn the identity of the sender of the anonymous messages.

44.     Despite being aware of negative consumer reviews, consumer complaints, and feedback from Apple, Defendants have continued to make the same representations to consumers.

45.     Indeed, Defendants not only acknowledged the consumer complaints regarding this issue, they even laughed at them.  In response to a consumer complaining about the fact that NGL Pro does not actually disclose "who sent" a message, the company's Product Lead wrote "Lol suckers" in a text message thread with Defendants Vir and Figueiredo.  In response to another complaint about NGL Pro's failure to disclose "who sent" a message, Defendant Figueiredo responded simply, "lol," and instructed a lower-level employee who had fielded the complaint to simply stop responding to the consumer and others who made similar complaints.

46.     Numerous consumers have complained to Defendants about these issues and have requested refunds, yet Defendants rarely, if ever, refund NGL Pro subscriptions.

*Defendants Market the NGL App to Children and Teens, Leading to Significant Instances of Cyberbullying, which Defendants Falsely Claim to Prevent Using AI*

47.     In addition to deceiving consumers, Defendants have also marketed the NGL App and NGL Pro to children and teens, despite being aware of the harms inflicted on these groups by past anonymous messaging applications.  Defendants claim to prevent these harms through their use of "world class AI content moderation" but, in reality, Defendants' claims are false.

48.     Defendants, through their website, have described the NGL App as designed to be a "fun yet safe place" for "young people . . . to share their feelings without judgment from friends or societal pressures."  Defendants have similarly called the App a "safe space for teens" and the App itself invites consumers to "play" with the App by using the pre-generated prompts designed by Defendants.  Defendants' website and the NGL App itself make use of fun, colorful images and emojis designed to appeal to children and teens.  An example from Defendants' website is shown here as Image 4.




**Image 4**

49.     Defendants also market the NGL App as suitable for children and teens through their App Store listing.  When Defendants first published the NGL App to the Apple App Store in December 2021, they rated the NGL App as suitable for individuals "12+."  When Apple suggested that this age rating may be

1  inappropriate given the complaints Defendants were receiving regarding the App,

2  Defendants did not follow Apple's recommendation and instead challenged

3  Apple's claim.

4      50.    Defendants also promote the NGL App through social media

5  channels, such as Instagram.  In an effort to entice teens and children to download

6  and use the NGL App, Defendants' social media channels regularly highlight

7  school-related activities, such as attending the first day of school, participating in

8  school drills, using hall passes to go to the school bathroom, falling asleep in class,

9  forgetting about school assignments, and gossiping about teachers.  Defendants'

10  social media channels also highlight other child-and teen-related topics such as the

11  quality of children's television shows and gossiping about parents.  These efforts

12  are intended to highlight for children and teens how the NGL App can be used by

13  these groups and to entice children and teens to download the App and join their

14  peers.

15      51.    Defendants' internal communications likewise reflect their plan to

16  market the NGL App to children and teens.  For example, as Defendants worked to

17  increase engagement with the NGL App in the spring of 2022, Defendant Vir

18  suggested that the team should "push [the NGL App] to 5 kids at a random school

19  in Florida" in order to see if it could gain viral traction.  Defendant Figueiredo

20  observed, however, that the team already "tried that and it didn't really work."

21  Undeterred, the company's Product Lead proposed that the team try to "get 10 kids

22  at one high school[.] Have them post [the NGL App link] and replies[.] Combo

23  with influencer so it looks cool[.]"  That same individual later observed, "We need

24  high schoolers not 20 something[s]," suggested that the team "do [a] high school

25  strat[egy]," and advocated that the team "should target high school micro

26  influencers."  Defendant Figueiredo likewise observed that the team should target

27  "the popular kids" in an effort to drive engagement.

28

-17-

52.     Defendants have also contacted teens directly to promote the NGL App.  For example, Defendant Figueiredo asked the company's Product Lead to "help with high schools, getting kids who are popular to post and get their friends to post" and noted that the "best way is to reach out on [Instagram] by finding popular girls on high school cheer [Instagram] pages."  Defendants also set up Instagram pages for specific high schools to promote the NGL App and directly messaged individual students at those schools via Instagram to ask them to use the NGL App and share the app with their friends.

53.     Defendants engaged in these extensive marketing activities despite being aware of the substantial harm that had resulted from past anonymous messaging apps.  For example, in 2021, anonymous messaging apps Yolo and LMK were suspended from the social media platform Snapchat amidst allegations of widescale cyberbullying.  In March 2022, as Defendants were actively marketing the NGL App to children and teens, Snapchat announced that it would ban all anonymous messaging applications from its platform because it had "determined that even with safeguards in place, anonymous apps pose risks for abuse that are impossible to mitigate at an acceptable level."  Snapchat specifically highlighted "bullying" and "harassment" as some of the "harmful behaviors" associated with anonymous messaging applications.

54.     Defendants shared with each other media articles regarding the harms caused by Yolo and other past anonymous messaging apps.  Despite this, Defendant Vir went so far as to contact the CEO of Yolo and request that he share design information so that Defendants could implement it in the NGL App, despite being aware of the harms that Yolo had caused.

55.     Defendants' efforts to attract children and teens to their platform quickly worked as numerous children and teens began using the App during the summer of 2022.

56.     As greater numbers of children and teens began using the NGL App, so too did complaints of harmful conduct increase.  Defendants have received numerous complaints from parents of children and teens who use the App.  These complaints reference, among other things, rampant cyberbullying and threats against children and teens that have been made through the NGL App.  Consumers have also reported to Defendants instances of self-harm and even suicide as a result of using the NGL App.  For example, in June 2022, Defendants received a complaint from a consumer stating that their friend had "attempted suicide" because of the NGL App.  Similarly, in September 2022, Defendants received a complaint from a consumer stating that they were likewise contemplating suicide because of the NGL App.  Defendants received numerous other complaints similarly referencing or threatening self-harm due to the NGL App yet made no changes to the design of the NGL App or their marketing of the NGL App in response.

57.     Defendants have received hundreds of complaints from parents, children, and teens about harm caused by the NGL App.  These harms were not reasonably avoidable.

58.     Indeed, recognizing the prevalence of these issues, Defendants tout a "Safety Center" on their website that purportedly provides a "rundown of how bullying is handled on NGL."  The "Safety Center" includes a "Parents" page, shown above in Image 5.  On the "Parents" page, Defendants purport to answer questions such as, "Why is my child using [the NGL App]?"  In response to this question, Defendants represent that NGL App is designed to be "a new means of expression for your child's thoughts and feelings" and promise that "[i]f your child is the target of bullying on NGL, we're here for you and your family and can help you handle it in the best way possible."



**Parents**

How to keep your child safe on NGL

**Learn More**

**Image 5**

59.     Defendants' "Safety Center" also includes a page entitled "Educators" that purports to provide similar resources for "Teachers and administrators."  This page likewise purports to answer questions such as "Why are my students using NGL?," "How can I protect my students who use NGL?," and "I'm concerned about my students' use of NGL; what can I do?"  These pages reflect that Defendants were well aware of the harm taking place on the NGL App, yet continued to market the NGL App to children and teens.

60.     Defendants represent to the public the NGL App is safe for children and teens to use because Defendants utilize "world class AI content moderation" including "deep learning and rule-based character pattern-matching algorithms" in order to "filter out harmful language and bullying."  Defendants further represent that they "can detect the semantic meaning of emojis, and [] pull[] specific examples of contextual emoji use" allowing them to "stay on trend, [] understand

lingo, and [] know how to filter out harmful messages."

61.    In reality however, Defendants' representations are not true. Harmful language and bullying, including through the use of emojis, are commonplace in the NGL App—a fact of which Defendants have been made aware through numerous complaints from users and their parents. Media outlets have reported on these issues as well. For example, one media outlet found in its testing of the NGL App that the App's "language filters allowed messages with more routine bullying terms . . . including the phrases 'You're fat,' 'Everyone hates you,' 'You're a loser' and 'You're ugly.'" Another media outlet reported that it had found that "[t]hreatening messages with emojis that could be considered harmful like the knife and dagger icon were not blocked." Defendants reviewed several of these media articles, yet have continued to represent that the NGL App is "safe" for children and teens to use given the "world class AI content moderation" that they allegedly employ.

62.    Defendants were also made aware of these issues through complaints from concerned educators, parents, and children. As just one example, in early 2023, an assistant principal at a high school in New York complained to Defendants that the NGL App was being used by students to send "threatening" and "sexually explicit content" that was "significantly affecting the mental health and well-being of our students." Defendants received numerous similar complaints that demonstrated the falsity of their representations related to their "world class AI content moderation" yet made no changes to those representations or the design of the NGL App in response.

### *Defendants Collect Personal Information from Children Under the Age of 13 in Violation of the COPPA Rule*

63.    Defendants also collect personal information from children under the age of 13 without notifying parents or obtaining verifiable parental consent.

Defendants possess actual knowledge that they are collecting and maintaining personal information from children. Thus, in collecting personal information from children under the age of 13 with actual knowledge, Defendants are subject to the COPPA Rule.

64. Defendants are aware of numerous children under the age of 13 that use the NGL App, as they have received complaints from parents and children that explicitly reference the child's age. Despite being aware of these consumers under the age of 13, Defendants have not removed these consumers from the platform, continue to collect and retain their data indefinitely, and have not implemented any other functionality that would prevent them from accessing the App. Defendants do not impose, implement, or require any age-screening in connection with the downloading, installation, or use of the NGL App.

65. Defendants possess actual knowledge that they collect personal information from children under the age of 13 as they have received complaints from children under the age of 13 and their parents that have contained the child's age.

66. Defendants have not provided notice to the parents of those children regarding the data that they collect, store, and maintain. Nor have Defendants obtained verifiable parental consent from parents of these children. Nor have Defendants provided reasonable means to stop further use of or delete the data. Defendants also claim to retain all consumer data provided to them indefinitely and thus retain data regarding consumers under the age of 13 for longer than reasonably necessary.

67. Defendants possess actual knowledge of COPPA as evidenced by, at minimum, their internal communications and their agreements with third parties.

68. Based on the facts and violations of law alleged in this Complaint, Plaintiffs have reason to believe that Defendants are violating or are about to

violate laws enforced by the FTC and the Los Angeles County District Attorney.

## VIOLATIONS OF THE FTC ACT

69.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

70.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

71.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).

## COUNT I

**Misrepresentations Regarding the NGL App & NGL Pro**

**(By Plaintiff Federal Trade Commission)**

72.     In connection with the marketing, promotion, distribution, or sale of the NGL App and NGL Pro, Defendants represent, directly or indirectly, expressly or by implication, that:

a)      The anonymous messages that consumers using the NGL App will receive are from their friends or other social media contacts;

b)      Consumers who purchase NGL Pro will be provided the identity of the people who have sent them anonymous messages through the NGL App; and

c)      Defendants use "world class AI content moderation" including "deep learning and rule-based character pattern-matching algorithms to filter out harmful language and bullying."

73.     In fact, in numerous instances when Defendants make these representations:

a)      The anonymous messages that consumers using the NGL App

-23-

receive are not from their friends or other social media contacts but, instead, are fake, computer-generated messages that actually come from the Defendants;

b)      Consumers who purchase NGL Pro will not be provided with the identity of the people who have sent them anonymous messages through the NGL App; and

c)      Defendants' AI content moderation fails to filter out harmful language and bullying.

74.     Therefore, Defendants' representations constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

### Unfair Marketing of Anonymous Messaging App to Children and Teens
### (By Plaintiff Federal Trade Commission)

75.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

76.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).

77.     In connection with the marketing, promotion, distribution, or sale of the NGL App and NGL Pro Defendants have specifically targeted children and teens knowing that use of anonymous messaging apps by these groups causes substantial injury.

78.     Defendants' acts or practices cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

79.     Therefore, Defendants' acts or practices constitute unfair acts or

practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

## VIOLATIONS OF ROSCA

80.    The Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401-05 became effective on December 29, 2010.  Congress passed ROSCA recognizing that: "[c]onsumer confidence is essential to the growth of online commerce.  To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business."  Section 2 of ROSCA, 15 U.S.C. § 8401.

81.    ROSCA prohibits certain unfair or deceptive internet sales practices with a "negative option feature," which is defined as: "in an offer or agreement to sell or provide any good[] or service[], a provision under which the consumer's silence or failure to take an affirmative action to reject good[] or service[] or to cancel the agreement is interpreted by the seller as acceptance of the offer" by the Telemarketing Sales Rule ("TSR"),16 C.F.R. § 310.2(w).

82.    ROSCA generally prohibits charging consumers for a good or service sold in a transaction effected on the Internet through a negative option feature, unless the seller, among other things: (1) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information and (2) obtains the consumer's express informed consent before making the charge.  *See* 15 U.S.C. § 8403.

83.    Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404, and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of ROSCA constitutes an unfair or deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III

**Violation of ROSCA – Inadequate Disclosures & Non-Consensual Charges**

**(By Plaintiff Federal Trade Commission)**

84.    In connection with charging a consumer for a good or service sold in a transaction effected on the Internet through a negative option feature, Defendants failed to:

> a)    Clearly and conspicuously disclose all material terms of the transaction before obtaining the consumer's billing information; and
>
> b)    Obtain the consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account through such transaction.

85.    Therefore, Defendants' acts or practices violate Section 4 of ROSCA, 15 U.S.C. § 8403 and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

86.    Defendants committed these violations with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

## VIOLATIONS OF THE COPPA RULE

87.    Congress enacted COPPA in 1998 to protect the safety and privacy of children online by prohibiting the unauthorized or unnecessary collection of children's personal information online by operators of Internet websites and online services.  COPPA directed the Commission to promulgate a rule implementing COPPA.  The Commission promulgated the COPPA Rule, 16 C.F.R. Part 312, on November 3, 1999, under Section 1303(b) of COPPA, 15 U.S.C. § 6502(b), and Section 553 of the Administrative Procedure Act, 5 U.S.C. § 553.  The Rule went into effect on April 21, 2000.  The Commission promulgated revisions to the Rule that went into effect on July 1, 2013.  Pursuant to Section 1303(c) of COPPA, 15 U.S.C. § 6502(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Rule constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

88.    The Rule applies to any operator of a commercial website or online

service directed to children under 13 years of age (which includes operators of online services with actual knowledge that they are collecting personal information directly from users of another website or online service directed to children), or any operator that has actual knowledge that it is collecting or maintaining personal information from a child under 13 years of age.  16 C.F.R. § 312.3.  The definition of "personal information" includes, among other things, a "first and last name," "online contact information," "a screen name or user name," a "persistent identifier that can be used to recognize a user over time and across different Web sites or online services," such as a "customer number held in a cookie, an Internet Protocol (IP) address, a processor or device serial number, or unique device identifier," a "photograph, video, or audio file where such file contains a child's image or voice," and "[i]nformation concerning the child or the parents of that child that the operator collects online from the child and combines with an identifier described in this definition."  16 C.F.R. § 312.2.

89.    Among other things, the Rule requires subject operators to meet specific requirements related to collecting, using, or disclosing personal information from children, including:

a)    Providing direct notice to parents of the information they collect online from children, how they use such information, and their disclosure practices for such information, among other required content (16 C.F.R. § 312.4(b));

b)    Obtaining consent from parents before any collection or use of personal information from children (16 C.F.R. § 312.5(a)(1));

c)    Providing the parent with the opportunity at any time to delete the child's personal information (16 C.F.R. § 312.6(a)(2)); and

d)    Retaining personal information collected from children online only as long as is reasonably necessary to fulfill the purpose for which

the information was collected (16 C.F.R. § 312.10).

90.    Pursuant to Section 1303(c) of COPPA, 15 U.S.C. § 6502(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Rule constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IV

**Violation of the COPPA Rule – Failure to Provide Proper Notice to Parents of Children, Obtain Verifiable Parental Consent, or Provide Reasonable Means for Parents to Stop Further Use or Delete the Data**

**(By Plaintiff Federal Trade Commission)**

91.    As described above, Defendants are "operators" subject to the COPPA Rule.

92.    In connection with the acts and practices described above, Defendants collected and used personal information from children in violation of the Rule, including by:

a)    Failing to provide direct notice to parents of the information they collect online from children, how they use such information, and their disclosure practices for such information, among other required content, in violation of Section 312.4(b) of the Rule, 16 C.F.R. § 312.4(b);

b)    Failing to obtain consent from parents before any collection or use of personal information from children, in violation of Section 312.5(a)(1) of the Rule, 16 C.F.R. § 312.5(a)(1);

c)    Failing to delete, at the request of parents, personal information collected from children, in violation of Section 312.6(a)(2) of the Rule, 16 C.F.R. § 312.6(a)(2); and

d)    Retaining personal information collected from children for

longer than reasonably necessary to fulfill the purpose for which information was collected, in violation of Section 312.10 of the Rule, 16 C.F.R. § 312.10.

93.   Therefore, Defendants' acts or practices violate the COPPA Rule and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF CALIFORNIA STATE LAW

## COUNT V

**Violation of California Business and Professions Code Sections 17500 *et seq.* (By Plaintiff Los Angeles County District Attorney on Behalf of the People of the State of California)**

94.   In connection with the marketing, promotion, distribution, or sale of the NGL App and NGL Pro, Defendants represent, directly or indirectly, expressly or by implication, that:

a)   The anonymous messages that consumers using the NGL App will receive are from their friends or other social media contacts;

b)   Consumers who purchase NGL Pro will be provided the identity of the people who have sent them anonymous messages through the NGL App; and

c)   Defendants use "world class AI content moderation" including "deep learning and rule-based character pattern-matching algorithms to filter out harmful language and bullying."

95.   In fact, in numerous instances when Defendants make these representations:

a)   The anonymous messages that consumers using the NGL App receive are not from their friends or other social media contacts but, instead, are fake, computer-generated messages that actually come from the Defendants;

b)     Consumers who purchase NGL Pro are not be provided with the identity of the people who have sent them anonymous messages through the NGL App; and

c)     Defendants' AI content moderation fails to filter out harmful language and bullying.

96.    Therefore, within three years preceding the filing of this Complaint, Defendants made untrue and/or misleading statements to the public in violation of California Business and Professions Code § 17500.

## COUNT VI

**Violation of California Business and Professions Code Sections 17200 et seq.**
**(By Plaintiff Los Angeles County District Attorney on Behalf of the People of the State of California)**

97.    Within four years preceding the filing of this Complaint, Defendants violated California Business and Professions Code § 17200 by engaging in business acts or practices that were unlawful, unfair, deceptive, or misleading, including, but not limited to, the following acts or practices:

a)    Violating California Business and Professions Code § 17500;

b)    Violating Section 5 of the FTC Act, 15 U.S.C. § 45(a);

c)    Violating Section 4 of ROSCA, 15 U.S.C. § 8403;

d)    Violating the COPPA Rule, 16 C.F.R. Part 312.

## CONSUMER INJURY

98.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, ROSCA, the COPPA Rule, California Business and Professions Code § 17500 *et seq.*, and California Business and Professions Code § 17200 *et seq.*  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

**PRAYER FOR RELIEF BY THE FEDERAL TRADE COMMISSION**

Wherefore, Plaintiff the Federal Trade Commission requests that the Court:

A.      Enter a permanent injunction to prevent future violations of the FTC Act, ROSCA, and the COPPA Rule;

B.      Grant preliminary injunctive and ancillary relief;

C.      Award monetary and other relief within the Court's power to grant;

D.      Award any additional relief as the Court determines to be just and proper.

**PRAYER FOR RELIEF BY THE PEOPLE OF THE STATE OF CALIFORNIA**

Wherefore, Plaintiff the People of the State of California requests that the Court:

A.      Issue an injunction prohibiting Defendants, their agents, employees, and all other persons and entities, corporate or otherwise, in active concern or participation with any of them, from engaging in unlawful, unfair, deceptive, or misleading conduct;

B.      Assess a civil penalty against Defendants for each violation of California Business and Professions Code § 17500 and California Business and Professions Code § 17200;

C.      Order Defendants to pay Plaintiff the People of the State of California's costs of suit, including but not limited to all costs of prosecution and investigation;

D.      Order Defendants to pay restitution as required by law;

E.      Grant such other and further relief as the Court deems equitable and proper.

\\\

\\\

Dated:  July 9, 2024

HOON CHUN, SBN 123516
Head Deputy District Attorney
hchun@da.lacounty.gov
STEVEN WANG, SBN 221950
Deputy District Attorney
swang@da.lacounty.gov
OFFICE OF LOS ANGELES
COUNTY DISTRICT ATTORNEY
GEORGE GASCÓN
211 West Temple Street, Suite 1000
Los Angeles, CA 90012
Tel: (213) 257-2450
Fax: (213) 633-0996

*Attorneys for Plaintiff the People of the State of California*

Respectfully submitted,

MILES D. FREEMAN, SBN 299302
mfreeman@ftc.gov
CARLA L. CHEUNG, SBN 291562
ccheung1@ftc.gov
SIOBHAN C. AMIN, SBN 308416
samin@ftc.gov
JOHN D. JACOBS, SBN 134154
jjacobs@ftc.gov
FEDERAL TRADE COMMISSION
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Tel: (310) 824-4300
Fax: (310) 824-4380

*Attorneys for Plaintiff Federal Trade Commission*

-32-